NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0111n.06

No. 16-1587

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Feb 17, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOCKQUEZ SCOTT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| KENT COUNTY; SHERIFF DEPUTY BRAD | ) | DISTRICT OF MICHIGAN |
| LYONS, in his individual and official capacity, | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE:    MERRITT, MOORE, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**  Following his arrest for creating a disturbance, Jockquez Scott was detained at the Kent County Correctional Facility, which maintains video recordings of activities in its cells.  Due to Scott's disruptive behavior in the communal holding cell, police officers decided to move him to another cell.  In response to Sheriff Deputy Brad Lyons's requests that he exit the cell, Scott did so with clenched fists that Lyons pointed out to him and requested him to unclench.  Scott responded by taking a slight step toward Lyons, who then took Scott to the ground.  Scott brought suit against Lyons and Kent County, alleging claims for excessive force in violation of the Fourth Amendment and Fourteenth Amendment, under 42 U.S.C. § 1983.  The district court granted summary judgment for defendants.  For the following reasons, we **AFFIRM** the judgment of the district court.

## I.    BACKGROUND

Scott was arrested on October 31, 2012, for engaging in a disturbance at a store in Grand Rapids, Michigan.  According to the police incident report, an officer observed Scott in the parking lot of the store yelling at another man.  When the officer got their attention, Scott "acted as if the confrontation was no big deal" turned and went into the store.  The officer then observed Scott inside the store, "engaged in obvious trouble with the store employees," who appeared to be trying to eject him.  The officer stated that he intervened after seeing Scott shove one of the store clerks, arrested Scott outside the store, and wrote in his incident report that he was "obviously intoxicated."  The store employees told the officer that Scott had asked to use the bathroom and when told that there was no bathroom for customers, started swearing and refused to leave.  The employees declined to press charges for either trespassing or assault.  Scott was charged with creating a disturbance and taken to Kent County Correctional Facility.  Scott apparently also had an outstanding warrant for unpaid fines, but that charge was not referenced in the officer's incident report.

Scott arrived at the police station around 1 a.m. on October 31.  Deputy Lyons, who has worked as a corrections officer at the Kent County Sheriff's Department since 2001, was at the booking counter.  Lyons placed Scott in a holding cell with other occupants.  According to Lyons, Scott was "yelling and screaming and throwing clothes around."  Scott asked to use the restroom, and Lyons and Officer Matt Dziachan escorted him there without placing him in handcuffs.  Before returning Scott to the cell, the officers performed a pat down and did not find any weapons

When Scott returned to the cell, he continued his disruptive behavior, prompting Lyons and Dziachan to move him to another cell.  Scott alleges that he was "not being physically aggressive" when the police attempted to move him.  Lyons testified that after Scott was asked to

come out of the cell, he stayed inside and began to complain loudly, yelling and making statements about beating other inmates in the cell, though Lyons did not believe he was targeting any specific individuals. At that point, Lyons told him to come out. In his complaint and deposition testimony, Scott claimed that after he came out of the cell, Lyons "tapped [his] shoulder" from behind three times and then "struck [him] in the face."

The video recording provided in the record contradicts these allegations and testimony. Though there is no audio, the video shows Scott's agitated actions prior to the move, including large gestures with his arms and pacing around for several moments before responding to the officers standing at the door. The video shows Lyons in front of Scott as Scott exits the cell, without handcuffs; shows that Scott's fists are clenched, that Lyons speaks to him and points to his fists, and that Scott then takes a slight step towards Lyons, placing Scott very close to Lyons as Scott exits the cell. Lyons testified that Scott started to cuss at him after exiting the cell, which caused Lyons to tell him to relax and unclench his fists. At this point, Lyons states that Scott stepped towards him, that Scott "was heading one way and he forty-fived [Lyons's] way." Scott concedes that he took a "slight step towards . . . Lyons," but states it was to talk to him. Perceiving Scott's posture as threatening, Lyons reached around Scott's head and neck and took him to the ground. Several officers quickly came to the scene and Scott was escorted away shortly thereafter, leaving blood on a towel on the floor. It is unclear how Scott's nose was injured. Lyons testified that his hand did not touch Scott's face, and that his nose could have been injured from his face hitting the floor or Lyons's shoulder.

During his deposition, Scott was shown still photos from the video. Scott testified that he did not recall stepping towards Lyons, and if he turned towards him it was in response to Lyons speaking to him. Scott maintained that he was not mistaken about being tapped on the shoulder

from behind and punched in the face, and stated that he could not tell what the images from the video depicted and they did not refresh his recollection of the incident.

According to notes made by Nurse James McFadden at 1:55 a.m., Scott had a small, bleeding laceration on the right side of his nose. His notes also indicated that Scott had been loud and argumentative while in the holding cell, uncooperative while being moved, yelled at deputies while he was on the floor, and that his vitals were not taken because he would not cooperate. The report also stated that Scott appeared intoxicated, but "alert [and] oriented." Following his examination, Scott was handcuffed and taken to a solo cell where he remained until his release later that day. A subsequent medical screening report, written at 10 a.m. on October 31, indicated that Scott had been hit in the nose and that his nose was swollen. After his release, Scott sought treatment at Spectrum Hospital and a medical report noted that he had a "superficial abrasion" on the bridge of his nose, which was "tender to palpation." The report recorded his diagnosis as "[n]asal fracture versus contusion." He was given pain medication and discharged.

Scott filed suit in district court, alleging excessive force claims against Lyons under 42 U.S.C. § 1983 for violation of his Fourth Amendment and Fourteenth Amendment rights, and a claim against Kent County for constitutional violations. The defendants filed a motion for summary judgment, which the district court granted. Scott timely appealed.

## II.    ANALYSIS

### A.    Standard of Review

We review a district court's grant of summary judgment de novo. *Brown v. Lewis*, 779 F.3d 401, 410 (6th Cir. 2015). Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a summary judgment motion, we view all

facts and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.   Claims against Lyons

To establish a claim under 42 U.S.C. § 1983, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013). Scott alleges that Lyons used excessive force in violation of his rights under the Fourth and Fourteenth Amendments. Lyons maintains that Scott was not deprived of his constitutional rights and raises the defense of qualified immunity.

Qualified immunity generally protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Courts use a two-prong analysis to determine whether qualified immunity applies. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We may discuss the prongs in either order, and the officer is entitled to qualified immunity if the plaintiff cannot establish both prongs in our inquiry. *Id.* For the first prong, the plaintiff must show that a constitutional violation occurred based upon applicable law and viewing the facts in the light most favorable to the plaintiff. *Brown*, 779 F.3d at 411 (citing *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005)); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). To satisfy the second prong, the plaintiff must show that "the right was clearly established at the time of the incident." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013). A right is "clearly established" when its "contours" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202. The court makes this inquiry "in light of the specific context of the case, not a broad general proposition." *Id.* at 201.

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Before the district court, the parties disagreed as to the standard applicable to Scott's excessive force claims. Scott argued for the Fourth Amendment's reasonableness standard, while Lyons argued that the Fourteenth Amendment "shock the conscience" standard should apply. The district court determined that Lyons was entitled to qualified immunity under either because Scott could not make the necessary showing for either claim under the second prong of the qualified immunity analysis. Because Scott does not address his Fourteenth Amendment claim in his appellate briefing, we affirm the district court's grant of summary judgment on that claim and evaluate Scott's Fourth Amendment claim on appeal.

We thus apply "an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting [Lyons], and not to [his] underlying intent or motivation," and balance "the nature and quality of the intrusion on [Scott's] Fourth Amendment interests against the countervailing governmental interests at stake." *Burgess*, 735 F.3d at 472 (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 466-67 (6th Cir. 2006)). This balancing is guided by three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting or attempting to evade arrest by flight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396). The use of force is "judged from the perspective of a reasonable officer on the scene, rather with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of

the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). Scott argues that Lyons's use of force was objectively unreasonable in violation of the Fourth Amendment. He states that he was arrested for creating a disturbance—a non-violent crime—and did not pose a significant threat to Lyons or anyone else at the time he exited the cell.

As an initial matter, we must address the appropriate facts to use in our inquiry. In granting summary judgment to Lyons, the district court did not adopt the facts as alleged by Scott in his complaint or deposition testimony because those allegations were clearly contradicted by the video recording of the incident. Though Scott was shown stills from the video during his deposition, he maintained that he was not mistaken about being tapped on the shoulder and punched, and stated that he could not determine what the images depicted of the incident. Scott now acknowledges that the video is at odds with his complaint and his original deposition testimony that Lyons tapped him on the shoulder from behind and then punched him in the face, but asserts that his "testimony does not blatantly contradict the record so that no reasonable jury could believe, [by watching] the video, excessive force was applied." He contrasts this to *Scott v. Harris*, 550 U.S. 372, 378-79 (2007), where the Supreme Court determined that the video evidence of the plaintiff driving contradicted his testimony that his driving was not a threat to others, that the roads were empty, and that he was in control of his vehicle. Scott argues that the video footage supports his claim that he was non-violent and non-aggressive when leaving the cell, and that "even if part of [his] testimony is blatantly contradicted by the [video] recording, that does not permit the district court to discredit his entire version of events." *Coble v. City of White House*, 634 F.3d 865, 870 (6th Cir. 2011).

Though the district court found that the video did "not in and of itself resolve the [summary judgment] motion," it did establish that there was "clearly an issue with [Scott], to

which Deputy Lyons responded." The court found that the video contradicted Scott's assertion that his manner was non-threatening, as it showed him exit the cell with his hands in fists and that he took a step toward Lyons.

Scott himself testified that he was yelling and cursing while in his cell prior to the incident. Lyons also stated that Scott was shouting and throwing clothes around, and the notes made by Nurse McFadden indicate that Scott had been loud and argumentative while in the holding cell. The video confirms that prior to being removed from the cell holding other detainees, Scott was pacing, clearly agitated, and gesturing wildly. McFadden's notes also indicate that Scott appeared intoxicated, and the incident report written at the time of Scott's arrest stated that he was "obviously intoxicated." Scott's intoxication and his unruly behavior prior to his exit from the cell were part of the factual context known to Lyons. When Scott walked out, the video shows that his fists are clenched and that Lyons looked at and then pointed to Scott's fists. The video then shows, as Scott concedes on appeal, Scott step toward Lyons, with his fists still clenched and within swinging distance.

Under *Pearson*, we need not determine whether a constitutional violation occurred under these facts as this case can be resolved on the second prong of the qualified immunity test. *See* 555 U.S. at 236. Under the second prong, Scott must point to clearly established law that would have put a police officer on notice that a takedown in such close quarters, under these circumstances, was an unlawful use of force. A right is clearly established when its contours are sufficiently clear that a reasonable official would understand that his conduct violates that right. *Wheeler v. City of Lansing*, 660 F.3d 931, 938 (6th Cir. 2011) (quoting *Anderson v. Creighton*, 438 U.S. 635, 640 (1987)). A right may be clearly established "even if there is no case involving 'fundamentally similar' or 'materially similar' facts." *Burchett*, 310 F.3d at 945 (quoting *Hope*

*v. Pelzer*, 536 U.S. 730, 740 (2002)). Rather, the question is whether Lyons had "fair warning" that his actions were unconstitutional. *Hope*, 536 U.S. at 741. The Supreme Court has clarified that the "dispositive question is whether the violative nature of *particular* conduct is clearly established," examined "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). In order to meet the clearly established prong, a plaintiff must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

Scott cites only to *Griffith v. Coburn*, 473 F.3d 650, 658-59 (6th Cir. 2007), where we determined that an officer's use of a choke hold on a suspect sitting on his couch at home, passively resisting the officer's commands, was objectively unreasonable. The circumstances presented in this case are not analogous to those in *Griffith*. While Scott was being removed from a cell for disruptive conduct, he stepped towards Lyons in close quarters, unhandcuffed and with clenched fists. We have not found other Supreme Court or Circuit precedent that would have put Lyons on notice that his takedown was an excessive use of force in this situation.

Because Scott has not met his burden on this inquiry, we affirm the district court's grant of summary judgment to Lyons on the basis of qualified immunity.

## C. Claim Against Kent County

Scott also alleges a claim against Kent County for its failure to supervise corrections officers, which he argues allows the officers to continuously violate inmates' constitutional rights. *See Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978) (holding that municipalities and local governments can be sued under § 1983 for constitutional deprivations made pursuant to governmental customs or policies). The district court determined that because Scott had not established that a constitutional violation occurred with respect to his

claims alleged against Lyons, his claim against the County must be dismissed. *See Blackmore v. Kalamzoo Cty.*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

The district court also determined, in the alternative, that Scott's claim against Kent County failed for lack of evidence, and we affirm its judgment on this basis. A plaintiff making a "failure to supervise" claim must establish that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). To support his failure to supervise claim, Scott only offers evidence that Kent County does not conduct yearly performance evaluations on its corrections officers. This is not sufficient to prevail under a failure to supervise theory. We affirm the district court's grant of summary judgment to Kent County in Scott's municipal liability claim.

## III.     CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's grant of summary judgment to the defendants.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** I disagree with the majority that Lyons is entitled to qualified immunity. There is ample evidence that "the right which was violated was clearly established" in our circuit. *Bultema v. Benzie County*, 146 F. App'x 28, 37 (6th Cir. 2005). We have held that an officer's conduct is not objectively reasonable where he performs a "takedown" of an individual already in custody, who, despite being argumentative and possibly intoxicated, was not actually aggressive against any officers. *Laury v. Rodriguez*, 659 F. App'x 837, 843–44 (6th Cir. 2016); *see Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 412 (6th Cir. 2015) (holding that a jury could find that an officer was unreasonable when he shoved an individual face-first into a wall after the individual verbally threatened and spat on officers, but never physically resisted arrest). Although *Laury* and *Turner* post-date Scott's arrest, our cases prior to his arrest made clear that "there undoubtedly [was] a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others." *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009). This does not require that in order to be free from violent force a suspect must be handcuffed at the time such force was used. *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) (holding that the fact that plaintiff "was not handcuffed at the time he was struck does not preclude a finding of unreasonableness" even where he had earlier attempted to evade arrest). In *Malory v. Whiting*, 489 F. App'x 78, 79–80 (6th Cir. 2012), we held that officers were not entitled to qualified immunity where they "grabbed Plaintiff's neck and shoved him into the booking counter" while the plaintiff was not handcuffed. At the time of the incident, plaintiff had gotten into a minor dispute with the booking officers, and had begun to undress so that he could be searched. *Id.* at 80. The takedown began when an officer "apparently became concerned when Plaintiff put his belt over

his shoulder." *Id.* Although the officer perceived this as threatening, we nonetheless held that "[i]n light of [plaintiff's] conduct, reasonable officers would have understood that an obvious legal norm prohibited them from tackling a suspect who made only a mild show of resistance." *Id.* at 86.

When we view the facts in the light most favorable to Scott, even taking into account the video evidence that contradicted his testimony, it is clear that a reasonable jury could dispute whether Lyons was objectively reasonable in violating a clearly established right. Scott was arrested for creating a disturbance, which is "not a severe offense that would support a greater use of force." *Lustig v. Mondeau*, 211 F. App'x 364, 370 (6th Cir. 2006). Defendants do not claim that Scott ever attempted to evade arrest. *See Malory*, 489 F. App'x at 83. Before the incident, the officers performed a pat down on Scott and did not find any weapons. R. 54–3 (Lyons Dep. at 56) (Page ID #339). Although the video confirms that Scott was unruly and yelling in the holding cell, there is no indication that he was being physically aggressive toward any officers. In fact, Lyons testified that Scott was "cooperative with us," that Scott did not threaten Lyons, and that Lyons did not perceive Scott as a threat. *Id.* at 53–56, 69–71 (Page ID #339–40). The officers even permitted Scott to use the restroom "unhandcuffed," and Lyons confirmed that if Scott had been perceived as a threat, they would have kept the handcuffs on. *Id.* at 55–56 (Page ID #339); *see Laury*, 659 F. App'x at 843 ("[t]hat [defendant] took [plaintiff's] handcuffs off after [plaintiff made a verbal threat] suggests a reasonable officer would not necessarily have viewed this comment as a threat.") Although Defendants claim that Lyons believed that Scott was taking a step to hit him, Scott on appeal argues that he took that step in order to talk to Lyons. Appellant's Br. at 5.

On the basis of these facts, I do not believe that Lyons is entitled to qualified immunity. Because I believe that there are genuine issues of fact regarding Scott's excessive-force claim, I respectfully dissent.